# Appeals of During, King and Miller.

Insolvent trustees, acting by advice of counsel, and in good faith, not held responsible for neglecting to proceed to avoid assignments, proceedings under which had been restrained by the court, by injunction which was afterwards dissolved when a distribution took place ; though it subsequently was held, that the assignments were voidable for patent defects and the property might have been recovered, the court having jurisdiction with full notice of the conduct of the trustees, having refused to remove them from their office.

Nor though the distribution in which they, as creditors, participated, shewed that there was property which had not been assigned, and which rendered the assignments voidable, under Thomas *vs* Jenks, 5 *Rawle*, 221, such property having

actually passed to the assignees; the extent of that decision being considered not to have been then distinctly understood.

Nor is there evidence of *mala fides*, in resisting a dismissal from their office, on the ground of neglect, &c., after they had been appointed by the court, without request made by them.

Nor are they accountable for dividends received by them, as releasing creditors, where they had executed the releases before their appointment by the court, which had notice of their conflicting interests, when they ordered them to give bond.

FROM the Common Pleas of *Philadelphia:*

January 17, and four subsequent days, and also re-argued February 12th. These appeals were taken from the decree of the court below, discharging Weber and McKean from their office as insolvent trustees of the members of the firm of R. & J. Phillips, and confirming the report of the auditor, finding that the appellees had no funds in their hands and that they had not by neglect of duty or mismanagement of the trust, rendered themselves liable to any sum of money.

Pending these appeals the Common Pleas again referred the matter to an auditor, who after taking testimony, reported a balance due by the appellees of $173,863 43, by reason of the neglect and mismanagement of the appellees as trustees.

By an order of this court, the proof taken before the second auditor was allowed to be read in evidence on the hearing of these appeals.

The controversy arose out of the assignments of R. & J. Phillips. On the 22d March, 1837, that firm assigned to Samuel Moss, certain property in and to arrive in the State of New York, in trust to pay Jonas Phillips & Sons in the first place, and then all other creditors. There was no stipulation for a release, but the assignment was not recorded here as required by the act of 1818.

On the 22d of June, the same firm made an assignment to the same parties of their partnership property, and specific real estate in trust to pay certain debts, and then releasing creditors generally. This assignment did not contain words transferring the individual property of the assignors. It was shown that one of them owned valuable furniture. This was, however, included in the inventory and sold, and the proceeds received and accounted for by the assignees under the deed. The other assignor owned real estate not mentioned in the assignment; but it was incumbered beyond its value.

On the 2nd September, 1837, the assignors prosecuted their petitions for the benefit of the insolvent laws. On the 19th of October they were discharged, and Weber and McKean appointed their trustees by the court. Before this Weber and McKean had executed releases as creditors under the June assignment.

In July, 1838, the court directed the appellees to enter into a bond with sureties in the penalty of $20,000, as insolvent trustees. This was done on the 29th of September.

In October, 1838, the Messrs. Lizardis presented a petition to the court, setting forth the June assignment and averring that Weber and McKean had, as releasing creditors, a direct interest in establishing the validity of the assignment against the petitioners, and the other non-releasing creditors who were about commencing proceedings to have it set aside as fraudulent, and praying the court to discharge the trustees and appoint others. A citation was taken, whether it was served did not appear, but the rule was discharged. In September and December terms, 1837, several attachment executions under judgments against R. & J. Phillips, had been served on the assignees as garnishees. But until the decision of Stewart *vs.* McMin, 5 *W. & S.* 100, in 1842, the rule was considered to be that these executions bound the surplus only, 4 *W. & S.* 410, 2 Miles 153.

On the 8th of February, 1838, the first account of the assignees under the June assignment was filed. On the 21st of March it was referred to auditors for distribution.

On the 29th September, 1838, Weber and McKean had commenced an action of assumpsit against the assignees. Mr. Randall, then being their counsel. On the 1st October, the assignees addressed a circular to the releasing creditors, informing them that this action was brought for the avowed purpose of procuring a decision, that the June assignment was void, and requesting the parties to employ counsel. Nothing further was done in this case until May 11, 1844, when the *narr.* was filed.

On the 20th February, 1838, the Lizardi's filed a bill in this court against the assignors, and the assignees alledging the June assignment to be fraudulent, because of the omission of the real estate of one of the assignors, and praying an injunction to restrain the assignees from distributing any of the proceeds of the assignment. The injunction issued the same day.

On the 3rd November, 1838, the assignees filed a bill in the nature of a bill of interpleader, against all the parties claiming title, and praying directions of the court as to their conduct under the June assignment.

On the 3d January, 1839, Fassit filed a bill against the assignees. In this bill it was alledged that the March assignment was fraudulent, because it assigned partnership effects to pay the individual liabilities of the members of the firm which was insolvent. The June assignment was attacked on the ground set forth in Lizardi's bill. An injunction issued on the 7th, restraining the assignees from further proceedings under the assignments.

The answer of the assignees to the bill of Fassitt, denied the fraud alledged, averred that the omitted house was incumbered beyond its value, and that they did not intend to distribute the funds, being restrained by injunction, until they receive the directions of the court, which they had prayed in their bill.

[Appeals of During, King and Miller.]

On the 15th April, 1839, the cause having been heard, the injunction was dissolved. The reasons are stated in 4 *Whart.* 409. On the 26th, Mr. Fallon, as counsel for a creditor, gave the assignees notice that the assignments were void, and that payments by them, though under an order of court, would be at their peril.

On the 6th May, 1839, the auditors appointed to distribute the fund mentioned in the account, which was filed on the 8th of February, 1838, were qualified, and then proceeded to make distribution of that fund and of other monies which had come to the hands of the assignees pending the reference. These were distributed by their report, among the preferred and releasing creditors, among whom were Weber and McKean. This report was confirmed in due course by the court, on the 21st of September, 1839.— Immediately afterwards certificates were issued by the Prothonotary, and the amounts paid to the respective creditors by the assignees.

On the 8th October, 1842, Sayen, a non-releasing creditor, presented a petition to the Common Pleas, setting forth the assignments made " on certain designated trusts," which " were fraudulent and voidable on that account;" that the trustees were interested in upholding the assignments and praying their discharge. The answer of the trustees referred to the decision in Fassitt *vs.* Phillips, as adverse to the attempt to set aside the assignment, and to the pendency of Hanson *vs.* Eustace, in the Supreme Court of the United States. It alledged that all the property had passed under the assignments and admitted they had taken no steps adverse to them, believing them valid. The replication in July, 1843, set forth that the March assignment had not been recorded, (the final settlement and payment under this assignment were made on the 25th May, 1839,) that the decision in Fassitt *vs.* Phillips, was in consequence of the answer denying the fraud charged, and was not a final decree on that question. The trustees then filed a further answer, in which they denied having neglected their duties, alledging they had brought suit in 1838, to assert any rights which might exist by reason of any defects in the assignments. After this no further proceedings were had, because they possessed no information to sustain it, nor funds to carry it on, and the questions were involved in several suits then pending, and likely to be settled in the Supreme Court. That the creditors might, if so disposed, have carried on the suits which were necessarily for the benefit of all the creditors, but they had not seen fit so to do, nor had they expressed any dissatisfaction with the conduct of the trustees until filing of the petition. On the 10th of February, 1844, the petition was dismissed, and an appointment of an auditor refused.

On the 29th January, the case of Hennessey *vs.* The Western Bank was argued, and it was there questioned whether the omis-

[Appeals of During, King and Miller.]

sion of general words conveying all the assignor's property from an assignment stipulating for a release did not render it void without regard to the fact of there being property not conveyed, as it was ultimately decided that it did.

On the 17th February, Wicht, Werner & Co. non releasing creditors, presented a petition to the court repeating the objection to the March assignment, that it had not been recorded, and alledging that the June assignment was fraudulent, because stipulating for a release it omitted certain real estate, the property of one of the assignors. That the trustees had notice of these facts by the insolvent proceedings, and had taken no steps to prevent a misapplication of the funds, saving the suit at law commenced but not prosecuted. A dismissal was prayed. The trustees submitted themselves to the court, and a reference was made to an auditor. The petitioners gave evidence before the auditor tending to shew that large sums of money had been drawn from the firm and invested in a house built by one of the members of the firm, and that there was other valuable property really belonging to the members of the firm which did not pass by the assignments. But it did not appear that the trustees had knowledge of these facts. They also read the communication of the trustees taken in the matter of the bankruptcy of the firm. McKean stated that he had received no property as trustee. He had performed certain. acts such as giving security by the advice of counsel. Whenever he had an intimation that any acts were unnecessary he referred to his counsel, and did what he was advised. He had an intimation that there was some property, but was advised he had nothing to do with it; it belonged to the asssignees. He understood the asssignment had been confirmed by the Supreme Court.

Weber stated that he was informed by his counsel, Mr. Chauncey, his duties as trustee would commence when that of the assignees ended. He understood the dividends were stopped by something done by Judge BALDWIN, but understood the assignment was confirmed by the Supreme Court. He had always been ready and willing to perform his duties as trustee, and acted under the advice of his counsel, Mr. Chauncey.

They also proved by one of the arbitrators to whom the case of Weber *vs.* Samuel had been referred that although several meetings were held nothing material had been done up to September, 1844.

In June, 1844, a correspondence passed between the counsel of the trustees and Messrs. Guillou & Fallon, representing numerous creditors of R. & J. Phillips, in which the former requested the latter to furnish proofs to sustain the suit brought to avoid the assignments.

In reply the grounds on which the assignments were considered void were referred to.

It was proved by the counsel who drew the June assignment that the house was omitted by his advice after consultation with Mr. Chauncey, because it was so much encumbered as to be worthless. The March assignment was prepared under the advice of their counsel in New York.

On the coming in of the auditor's report, which was confirmed, Weber & McKean petitioned to be discharged as trustees, which was granted and Miller appointed in their stead, and these appeals taken. The auditor among other reasons for holding them not accountable said, that notwithstanding all the litigation on the subject of these assignments, he could find no trace of an objection to the March assignment for want of a registry until it was taken in the replication to Sayen's petition in 1843, and that a trustee could not be held responsible for ignorance or oversight, when the objection had escaped so many counsel. As to the money paid away before their appointment, the assignees being discharged under Steward *vs.* McMin, of course these trustees were; and that they were entitled to the benefit of the presumption that the fund had all been paid away within the year after the assignment, there being no notice or proof that they had knowledge to the contrary. As to the June assignment, the record in Fassit *vs.* Phillips, exhibited the objection now made, and that all parties had acquiesced in that decision as determining the validity of the assignments, and that having no funds to prosecute their suit further it would have been imprudent to do so after that decision.— As to the dividends received, being purchasers by their release prior to their appointment and not being under obligations to attach the assignments, they were not accountable for these.

The action brought by Weber *vs.* McKean, as trustees against the assignees, was then prosecuted by Miller, and resulted in a verdict and judgment which was reversed. The court in error holding that the assignees were not liable for payments made under the first assignment, though after suit brought, until after notice was brought home to them that· the suit was directed against the March assignment, nor were· they liable for payments made under the decree of the court under the June assignment, though after notice of the suit.

This judgment was given May 15, 1848. On the 20th, the Common Pleas, pending these appeals, on the petition of Miller the substituted trusteee, appointed an auditor to inquire whether Weber & McKean, by negligent mismanagement or unfaithfulness in the execution of their trust, or otherwise, had rendered themselves liable in any way, and directed him to state an account and report in whatsoever they were so liable. As has been already stated, the evidence taken before this auditor, was read on the hearing of these appeals.

Before this auditor the counsel for Weber & McKean called a

number of witnesses, creditors or representing creditors of R. J. Phillips, (who were stated to be all the creditors within the jurisdiction,) who stated that they had never called on Weber & McKean to institute proceedings to avoid the assignments; some of them were ignorant of the assignments, and some of the insolvent proceedings.

Mr. Chauncey stated that he was consulted by Weber, one of the insolvent trustees; but he could not remember having been consulted about the assignments, or that any question was made as to their validity; he was under the impression that *Weber* and himself thought the insolvent assignments passed no property; he could not remember having expressed the opinion stated by Weber (above) but was under the impression he entertained it; he had had the two assignments before him and had no doubt of their validity prior to the decision of Hennessey *vs.* The Western Bank; his impression was they accorded with assignments which had passed for valid in and out of court; he could not recall any question proposed on that subject, but his advice was based on the belief the assignments were valid; he had no reason to suppose that Weber ever acted in opposition to his advice.

Mr. Jos. R. Ingersoll stated he had been consulted in 1842, by Weber & McKean, as their counsel, Mr. Chauncey being his colleague for Mr. Weber. He drew the answer to Sayen's petition, which assumed the validity of the assignments on grounds then deemed conformable to law; he believed Weber communicated to him Mr. Chauncey's views; until the decision in Hennessey *vs.* The Western Bank, he had always supposed the rule in Thomas *vs.* Jenks, required the omission of actual property to avoid an assignment stipulating for a release.

Mr. Ingraham and Mr. Phillips, the counsel for the voluntary assignees, stated they had understood that the decision in Fassit *vs.* Phillips, had obviated the objections raised to an immediate distribution under the June assignment, hence it took place immediately afterwards.

Mr. Phillips further stated that all objections to the discharge of the members of the firm of R. & J. Phillips, in the insolvent court were withdrawn, and no one manifested any interest in the matter. The names of Weber & McKean as trustees, were inserted by the clerk of the court, no one requesting or objecting to it.

Mr. Dunlap stated that Mr. Chauncey, who was consulted with reference to the drawing of the assignments, was of the opinion that they were in conformity to the existing laws. A question was made as to the propriety of inserting the incumbered house, but this was overruled.

They further proved by two of the non releasing creditors, that in 1848–9 they had made a bargain with counsel to prosecute their

claims for a contingent remuneration of 50 per cent., and by the present trustee that he had arranged with his counsel to allow them a contingent fee of one-third of the amount recovered.

A correspondence between the counsel of Miller and of Weber and McKean, occurring after the decision of Weber *vs.* Samuel, (the suit brought by the trustees in 1848) was read, in which a request was made to furnish proof of notice to these defendants, that that suit was directed against both assignments. In reply this was asserted as a fact, but no other evidence was furnished than was already in the possession of the substituted trustee. Afterwards when this suit was tried, the verdict resulted in discharging the assignees from liability under the March trust, but for a small balance remaining in their hands undistributed.

It was also proved that on the application being made to the court to permit the assignors to sign the insolvent assignments on the 29th of September, 1838, (which had been omitted) the attorney of Lizardi & Co. applied to the court to have the appointment of the trustees altered on account of their adverse interest as releasing creditors, but the court refused; whether of their own motion or on objection made, the witness could not recollect, saying that if the trustees were recreant to their trust they would be responsible.

*Guillou* and *Fallon* for the appellants.—The question is whether these parties as trustees are liable for gross negligence. The informality of the March assignment was patent, and what other objection has ever been made to it? Yet it is conceded by them that the allegations induced them to bring a suit which they never prosecuted, not even to the filing a *narr.*, until all the funds were gone; nor did they give notice or take any steps to prevent the loss of the money. Their liability for this has been passed on, 7 *Barr* 523, where it was the ground for discharging the assignees. They did not even require an account under that trust, nor that the preferred debt should be proved; nor in any way appear as trustees. The necessity of promptness is shewn by Okie *vs.* Kelley. The liability of trustees for negligence and loss by delay, &c. is shewn by 2 *Stor. Eq.* sec. 1268–75; *Lew. on Trusts* 297, 287, 95; 3 *W.* 445; 7 *Mass.* 198; 1 *Hov. on Fraud* 484–6; 9 *Barr* 210; 9 *W. & S.* 107. The otherwise inexplicable error of the court in appointing them trustees when their interests were wholly adverse, and when objection was made, can only be accounted for by the urgency of their desire to continue in office, and the representations that their neglect was at their own peril. For what purpose was this? An adverse trustee would have prevented the receipt of their dividends as releasing creditors. They alone as representing all the non releasing creditors could attach the assignment or claim before the auditor: 9 *Barr* 355; 7 *ib.* 523, yet

they did not do this; but on the contrary, preferred and obtained payment on their individual accounts. A still more palpable ground of liability is the allowance of the distribution of the proceeds of the individuals composing the firm, which it is not pretended was assigned. As to the dividends received by themselves, there is the additional principle that no trustee can receive the trust funds on his own account or profit by a neglect of his duty, 3 *W. & S.* 378; *Stor. Eq.* sec. 533; 3 *Mason* 312; 3 *M. & Sel.* 570. This too is an answer to the argument that they were without funds, for these dividends were part of the trust property. But why talk of want of funds when they employed counsel to resist efforts to remove them from their place. The want of information is answered by the fact that notorious as the litigation was, they never applied to parties or counsel for information: 3 *Penna.* 70. They rely on the advice of counsel, but there was no such advice given. The counsel bringing the suit in 1838, was dropped. Mr. Chauncey had no information on the vital point, the doubts as to the assignments and of their own suit for the purpose of testing them. Mr. Ingersoll was not employed until after the distribution in 1839. As to Fassit *vs.* Phillips, the decree purports to be merely interlocutory and is based on the assertion that the funds will not be distributed until the court shall decree it. It is said the objection to the March assignment was not stated until 1843. The notice in 1839, implied it, for there was no other objection, and it was expressly set forth in Hanson *vs.* Eustace 2 *How.* 697. The case is one in which trustees having clung to a trust for the protection of their private interests, have assumed the responsibility of all loss which has ensued to their *cestuis que trust* by reason of their neglect.

*Ch. Ingersoll, Randall* and *Dallas,* contra.—It is for the first time these parties have an opportunity of being heard, though their case is treated as prejudged by decisions on which their adversaries alone were heard. The question is how far, when the law is confessedly changed by judicial legislation, trustees are to be held responsible for ignorance in relying on the only lights in their possession. Facts as they existed in 1839, are to be the standard of judging them; for at that time all the loss accrued, all monies not then distributed have been collected. In 1837, the assignments were made, since declared to be fraudulent on their face. The insolvent trustees knew they had been drawn by most experienced counsel. They saw that these assignments presented no obstacle to a discharge in the insolvent court; and as late as 1845, the auditor and the court below saw nothing in their conduct subjecting them to liablility. Under the same facts they have been recently held liable in $173,000. The insolvent assignments not having been signed for a year the matter was entirely open to

[Appeals of During, King and Miller.]

creditors.   The attachments laid appear now to have been directed against the surplus owing to the small number of releasing creditors.   No act of their own made them trustees and the amount of the security was a hint by the court that their duties were confined to the surplus.   The application of Lizardi appears to have been refused by the court of its own motion, for it does not appear that it was even served; certainly no opposition is shown.   Thus the court, with the documents before them, and knowing their claim as releasing creditors, could see nothing conflicting in their duties.   Their suit was certainly directed against the surplus of which there was a probability, though it stood for any purpose which might be developed.   What were the objections to the assignment?   Until Hennessey *vs.* The Western Bank, and the replication to Sayen's petition, we look in vain for any intimation of objection but actual fraud.   On other grounds alone have the assignments been avoided, and these after the mischief was past remedy.   But who is liable for the neglect of the suit?   Clearly that was the business of the agent necessarily employed.   In this, as in all their other acts, they are shown to have acted under the advice of counsel.   Is it to be presumed they did not communicate the facts fully?   Mr. Chauncey admits his opinion and advice were based on the validity of the assignments, and it was not changed until Hennessey *vs.* The Western Bank.   Did he not know the contents of the papers after advising on the form?   What else had they to consult him about?   Their rights as against the assignees were their only rights as trustees.   As it was essential to employ such agency they are not responsible for the mistakes of that agent: *Story's Eq.* sec. 201; 5 *Ves.* 144: 4 *S. & R.* 24: *Lew. on Trusts* 117–18.

The next point is the bills filed and the decision in Fassit's case.   The record there exhibited every objection since sustained, and yet they are not alluded to either by counsel or court.   Had that decision been pronounced on the bill of interpleader, the defence would have been perfect; what mattered the accident that that case was first brought to a hearing?   The most important cases are thus settled by an interlocutory order which is considered as settling the principle.   The effect of that decision need not be discussed beyond remarking that the counsel of those whose responsibility was immediate to the court below, acted on it at once and treated the controversy as ended.   There is a distinction between the liability of mere legal trustees for those *sui juris* and others not competent to act.   Here were creditors for thousands of dollars proved not to have moved where it was perfectly competent for them to do so in the names of the trustees, or by advancing money to have compelled their action.   Why did not the attaching creditors sweep the fund?   Are they or their counsel

liable for not foreseeing the rule that their attachments bound property fraudulently conveyed as executions? These trustees had no funds. What contingent fee would have compensated counsel for the chance before Hennessey *vs.* The Western Bank? We see that one third and in some instances two thirds was considered proper, after the right of Miller was in effect decided.—Their avowed action spread on the records at the time shows they never dreamed of any impropriety, and it had the sanction of the court to which they as trustees were accountable, who refused to dismiss them, though admitting they were taking no action. The objections by the trustees to be removed are obvious. It would have been an admission of their own neglect. But it is supposed there is a distinction as to the dividends received. Their rights as releasing creditors had vested before their appointment, and they were not bound to sacrifice their private interests when appointed by the court trustees: Prevost *vs.* Gratz 1 *Pet. C. C.* 364; 2 *Wh.* 53; 13 *S.* & *R.* 333. They were purchasers of their dividends, and they obtained them by a decree which can only be overturned for fraud on the court.*

The opinion of the court was delivered by

GIBSON, C. J.—It is unnecessary to examine all the respondent's points, for at least one of them is well taken; or to sift the evidence with which the cause is loaded, in order to prove that they ought to have known more than they actually knew. They are not chargeable for negligence or ignorance; for it is a sound rule in Pennsylvania, and perhaps in England, though the decisions are discrepant there, that a trustee who has acted faithfully and by advice of counsel, is not answerable for mistake. The most prudent could do no more. It was said in Belchoir *vs.* Parsons, *Amb.* 209, that a trustee who acts by other hands than his own, whether from necessity or in accordance with usage, is not responsible for losses; and the principle is applied to the custody of trust property, which is put on a footing with that of a bailee. When a trustee has to steer his course among the rocks and shoals of his duty, he would be justly chargeable with the consequences of disaster, did he reject the services of a professional pilot, and act of his own head. He would be guilty, so to speak, of official barratry. On the other hand, he would not be answerable for losses induced by the incompetence of the pilot. It was well said by the Master of the Rolls in Vez *vs.* Emory, 5 *Vez* 144, that if the trustee, in that case, had paid by the advice of any counsel in England, he would not have held him liable: but it was ill said by the Chancellor in Doyle *vs.* Blake, 2 *Sch.* and *Lef.* 243, that he had no doubt the executors meant to act fairly, but that they

---

* The re-argument was confined to the question as to the dividends received.

had been misadvised, and the Court must proceed, not on the advice given, but on the acts done ; and that if the acts were wrong under the best advice which could be procured, public policy required that the trustee should be the person to suffer.    How short-sighted and cruel does this narrow dictum of Lord Redesdale appear, when it is contrasted with what was said by Lord Hardwicke in King *vs.* the Earl of Plymouth, 1 *Dick.* 126 ; "if there is no *mala fides*," said he—"nothing wilful in the conduct of the trustee—the Court will always favor him.    For as a trust is an office necessary in the concerns between man and man, and which, if faithfully discharged, is attended with no small degree of trouble and anxiety, it is an act of great kindness in any one to accept it : to add hazard and risk to that trouble, and to subject a trustee to losses which he could not foresee, would be a' manifest hardship, and deter any one from accepting so necessary an office."    His rule of responsibility is politic and just ; but Lord Redesdale's rule would throw the execution of trusts into the hands of knaves or fools.

What he said, however, was actually no more than a dictum ; for the administrators had consulted no one, professionally or otherwise.    They were self-advised, (the Chancellor probably used the word mis-advised, in that sense,) and they acted with culpable indifference to the interests they were bound to protect.    As they were charged, on that ground, the decision can scarce be said to conflict with Vez. *vs.* Emory.    No English or American case sustains Doyle *vs.* Blake ; for the misconduct charged in Oliver *vs.* Court, 8 *Price* 167, was supineness of the trustee in selling an estate at an undervalue, by the advice, not of counsel, but of a land surveyor, who was both the agent and the purchaser.    That was certainly culpable negligence. But whatever the rule might be in England, where the trustee may demand the direction of the Chancellor, it is not the rule in Pennsylvania, where the powers of the court do not reach so far ; nor was it the rule in New York, though I was told by the late Chancellor Kent, that in assuming the Chancellorship, without finding any positive limitation of his power, he gave relief wherever an English Chancellor would give it.    Yet in Thompson *vs.* Brown, 4 *Johns. ch.* 469, he said that courts of chancery had often declared a determination to relieve trustees acting on professional advice, or with the best judgment they could form.    The present, therefore, is a question not of negligence, but of intention ; and on the proof of good or bad faith, hangs every part of the case.

The respondents would be answerable had they concealed any part of their case from their counsel, with a view to use their advice for a cover ; and the argument is that they did not act by the advice of Mr. Chauncey or Mr. Ingersoll, given on a view of

the whole ground; for that they had not told them they sus-
pected the validity of the voluntary assignments, and that they
had brought an action to test it.   The fact stands on the memory
of counsel; and to convict the respondents of double dealing, it
ought to be clear and distinct.   But the witnesses spoke with
hesitation and something like doubt.   Neither of them recollect-
ed that he had been consulted about the validity of the assign-
ments, or that it had been doubted.   Mr. Chauncey could not
recollect the course of the advice given; but both he and Mr.
Weber thought the *insolvent* assignment conveyed no property.
About the action they had brought against the voluntary assig-
nees, Mr. Chauncey or Mr. Ingersoll said not a word.   Surely
these are not circumstances ill remembered or partly forgotten,
.to strip a man of his character or fortune.   It may well be that
Mr. Ingersoll, or Mr. Chauncey, was not particularly consulted
about the action, because it had been advised by another on his
own view of the case, and it would have been indelicate to procure
any one else to interfere with him; but from the scope of their
testimony, it is plain they were consulted about the assignments;
else why speak of what they thought of them ?   About what else
could they have been consulted ?   The thing they had to fear, was
the peril in which their equivocal position between two trusts had
placed them; and to go safely, it was necessary to go circumspectly.
Every step was taken by the advice of counsel.   Mr. Randall,
who cautiously brought the action, was consulted about the good-
ness of the assignments; and Mr. Chauncey, as well as Mr. In-
gersoll, was consulted about what was essentially the same thing
—the respondents' position as statutory assignees, which depend-
ed on it.   It has not been shown that they did the least thing of
their own head; and they are within the rule which brings the
contest to a question of *bona fides.*

  The single atom of evidence to create a suspicion of the want
of it, is their inactivity in prosecuting their action.   For what
anticipated objection to the assignment it was brought, we can
barely guess.   A counsel's act may affect his client with legal
consequences, but not with moral fraud; else the counsel's un-
skilfulness might ruin his client's reputation.   The present is
emphatically a question of good faith; and, in dealing with it,
we must not lose sight of the fact that, at the time material to
it, not only was the law of the case in a state of transition, but
that the opinion of the bar followed that of the bench with repug-
ance.   Mr. Randall, who with his colleague had stated the doc-
trine in Thomas *vs.* Jenks, which culminated in Hennessey *vs.* The
Western Bank, was the first consulted, and he brought suit against
the trustees, under the June assignment, because the Walnut
street property was not included in it; for the court had not gone
further at the time than to require that none of the debtor's

property should be left out; and it is to be presumed that he told his client not only what he had done, but his motive for it.   The opinion of Mr. Ingersoll and Mr. Chauncey, that the assignments were good, necessarily had a tendency to retard the prosecution of it.   The objection made to the March assignment was not that property was left out of it—for it contained no stipulation for releases—but that the effect of it would be to let in the separate creditors on the joint funds; but it was not persisted in.   True, the respondents counsel stated, five years afterwards, (and the same thing was admitted in the answer to Sayen's petition,) that the action was directed against both assignments; and so might it then be—for the incurable defect in the March assignment had been discovered.   It is true, also, that, in the unsettled state of the law, they may have thought the chance of avoiding it, for some undiscovered reason, was worth the trial: at least they may have thought that it was their duty to put themselves in a position to take advantage of any thing that might turn up.   That they left no stone unturned, or measure neglected, is proof that they were in earnest.   Even had they been altogether inactive, it is hard to see how the general creditors could have been prejudiced by it.   Till the funds collected under the March assignment had been distributed, the canker in it had not been discovered.   The actual suspicions of it were unfounded, and, in Fassitt and Phillips, abandoned; and the light subsequently shed on it, cannot give a peculiar hue to acts that were done in the dark.   I therefore lay the March assignment out of the case, and proceed to consider the respondents course in regard to the assignment of June.

The exception to it is, that they did not give formal notice of the object of their action.   One would think that the action itself which could not have been brought for any other purpose than to contest the title, was notice of it.   But they did not prosecute it with alacrity.   What was there in the case to urge it?   In the opinion delivered in Weber *vs.* Samuel, it was said, in relation to the charge of the judge who tried the cause, that if the present respondents, being actors, managed their action erroneously and faithlessly, as it was alledged, and by omission and supineness permitted the defendants in it to distribute the money innocently, the loss ought not to fall on those who were guilty of no laches. To this I agree; and had I understood the cause then as well as I do now, I would not have dissented from any part of the opinion.   But was there actually laches on either side? Unfortunately it was taken for granted by us all, that both sets of trustees could not be innocent; and the judge intimated that it was the duty of the respondents to give notice of their object, and to follow it up. It is to be remarked that though they had been the plaintiffs in the cause, they were only nominally so at the time of the trial,

and that their case was presented, at the argument in banc. by those who were and are now, their actual antagonists; and whose policy it was, not to stretch either of the strings to their bow so as to endanger it. Had the argument for the respondents been under their own control, it would have been easy for their counsel to present the facts in a way to demonstrate that neither notice nor active pursuit would have retarded the distribution or accelerated it. Lizardi's bill and injunction immediately preceded the respondent's action, and Fassitt's bill and injunction soon followed it. By these the trust fund was held in the gripe of the law, till the validity of the assignments should be determined on a motion to dissolve, or by a decree on the merits; and it is impossible to conceive how the general creditors could have lost by want of notice and hot pursuit. Nor can it be conceived that it constituted supineness so gross as to be evidence of conspiracy. The trustees under the assignments had notice from all quarters that their title was in contest; and formal notice *en pais*, in addition to the notice of record, could not have suspended the distribution for a greater period. It was actually stopped, and all parties waited for the day of trial. Involved in difficulty, doubt, and almost untried state of the law, it would be neither reasonable nor just to impute premeditated fraud to one party for having waited for it along with the rest.

The day of trial came; and it was determined in Fassitt *vs.* Phillips, which carried Lizardi *vs.* Phillips along with it, that the exclusion of certain worthless property from the June assignment —the only objection to it then thought of—did not taint it with constructive fraud. The bill charged that the March assignment was fraudulent, because it would pay the separate debts with the joint effects—a thing with which the general creditors had no concern, as the equity which forbids it is an equity between the partners themselves—but such as it was, it was not pressed, and opposition to the particular assignment was withdrawn till it was discovered, but too late to inculpate the respondents, that the deed was void because it had not been recorded. The decree was interlocutory; but the dissolution of the injunction explicitly settled the question of legal fraud, and left nothing for the final decree but the charge of actual fraud, which has been suffered to sleep till this day.

One would suppose this enough to justify inactivity, especially as the respondents had been advised that their own trust would not begin till the trust under the assignment should be ended.— Had Mr. Chauncey or Mr. Ingersoll been apprized of their suit, and neither of them says he was not, what would he have advised? Undoubtedly to await the determination of the question raised by the bills of Lizardi and of the Fassitts, which came off a few months afterwards. It could not have been presented in a shape

more favorable for the general creditors. The event appeared to render further action futile; and before that time nothing had been jeoparded. In no view whatever is the respondent's omission to prosecute the common law suit, which has since been prosecuted without effect, evidence of a design to turn the advice sought by them to a fraudulent end—for it is impossible to see how they could hope to profit by it.

It has been argued that as valuable furniture was left out of the June assignment, they were bound to attack it on a broader ground. But this furniture was actually turned over to the assignees, sold with the effects in the schedule, and applied to the same purpose; and this when the rule in Thomas and Jenks was scarce settled, little known, and less understood. It would appear to a layman that an accidental omission in the schedule which had worked no practical difference, would not impair the assignment, or call for professional advice. It must not be forgotten that the question is not whether the assignments might not have been attacked with success—now, every one knows they might,—but were the respondents bound to know it then? As the law stood, they could not have been avoided for the omission of property which had come into the trust fund; and they were not bound to anticipate the decision in Hennessy and the Western Bank. In this regard, as in all others, they have not been guilty of wilful mismanagement, and they are not responsible for ignorance of what was in the womb of time.

But it is said their position as directors of the one trust was inconsistent with their position as preferred creditors under the other. It is this alone which gives a deceptive appearance of force to the argument against them on the preceding points; for had they been no more than general creditors, no ingenuity could have got up a plausible charge against them. Their position, however, was for the consideration of the court that appointed them, and refused to supercede them when incompatibility was alledged against them. Can a trustee have better direction than the judgment of his court when it corroborates the advice of his counsel? They had been told that their trust was not to begin till the other trust should be finished; and in that view of it, their position was not incompatible with their interest or with purity of purpose. By itself, it was nothing; and it was not sought by them. They were appointed by the insolvent court, without their knowledge; and they did not accept the office till a year had elapsed. Had they designed to use it for a selfish purpose, they would not have waited so long. Being accepted, they resisted attempts to turn them out of it on suggestions that would have degraded them; and no honorable man would have done less. They resisted while anything was to be resisted; and they relinquished the office when the attempts to wrest it from them were

240 SUPREME COURT [*Philadelphia*

relinquished. I see nothing in that to create a suspicion of their fidelity.

It has been confidently argued that though they should not be charged with dividends received by the other preferred creditors, they must be charged with those received by themselves. Certainly less negligence is necessary to charge a trustee with money in his hands than with money lost; but the attempt is to charge the respondents, not for negligence, but for unfaithfulness. The evidence, however, no more proves the one that it does the other. They seem to have been always vigilant, and to have done, by the advice of counsel, every thing they could profitably do. But sustaining, as they did, distinct and independent characters, why should they be charged in the one with what they had received in the other? The argument is, that they, at least, can be reached without injustice; and that they ought not to reap a benefit at the expense of the general creditors, when, to deprive them of it, would leave them exactly where the payment found them; but it would equally prove that their successor might recover back the dividends made by the voluntary trustees, as it would leave them exactly where the payments found them. The respondents, as well as they, were encouraged by the inactivity of the general creditors to release the insolvent assignees before any step was taken to contest the legality of the assignments; and recourse to their future earnings was given up. They were purchasers of their preference before they were connected with the insolvent trust; and to deprive them of the consideration with which they parted, would deprive them of their debt; for they could not come in even *pari passu* with the general creditors, notwithstanding the latter stood by without uttering a word against the title to their preference when they purchased it. That is one ground on which they may claim the benefit of it; but there is another.

No rule is more firmly founded, than that what a creditor has conscientiously received, he may conscientiously retain. It is illustrated by Carson *vs.* McFarland, 2 *Rawle* 118, in which a creditor of an insolvent decedent, who had received more than his *pro rata* share of the assets, was not compelled to refund the excess; by Espy *vs.* Allison, 9 *Watts* 426, in which a party who had paid a bond erroneously supposed to be secured by a mortgage of his land, was not allowed to recover the money back; and by Boas *vs.* Updegrave, 5 *Barr* 546, in which a terre tenant who had paid a judgment under a mistaken impression that it bound his title, was subjected to the same rule. It is in substance the familiar rule that money which has not been received *mala-fide* or without consideration, cannot be followed; not, however, for want of ear-mark, as has been absurdly said, but for want of superior equity. In Rapalje *vs.* Emory, 2 *Dall.* 54, it was well said

that the distinction between a specific chattel and money is well known; that the owner of a chattel has a right to recover it from any one with whom it is found; but that to entitle the owner of money to recover it, there must be privity between him and the receiver of it, or at least an unjust receipt of it.   Morris *vs.* Tarin, 1 *Dall.* 147; Bogart *vs.* Nevins, 6 *S.* & *R.* 369; Irvine *vs.* Hanlin, 10 *S.* & *R.* 219; and Mathers *vs.* Pearson, 13 *S.* & *R.* 258, are to the same effect.   In Day *vs.* Murray, 9 *Johns.* 171, an agent had paid his principal's money on the wrong bill; yet the payment stood good; and in Rogers *vs.* Kelly, 2 *Camp.* 163, the rule was applied to a banker's payment of his principal's money in discharge of his own debt.   In Bize *vs.* Dickason, 1 *T. R.* 285, Lord MANSFIELD said that money so paid can be recovered back only when there is no ground to claim it in conscience.   In the first place, then, what privity was there between the respondents and the general creditors?   The money was paid to the respondents as preferred creditors, not as adverse trustees, and in satisfaction of debts as justly due in conscience as were the debts of the general creditors; and it was received in ignorance of the claim of those to whom it is now sought to apply it.   It was paid to the respondents as creditors, and if they received more than their share, no matter from what quarter, they are not bound to refund the excess.   In their character of preferred creditors, there is no privity between them and their successor in the statutory trust, unless as successor of the trustees under the assignments; and no one would assert that the latter could have recovered their payments back.   They were saved from liability in the action against them, only on that ground.   It has been truly said that in a Court of Equity, the only question is whether property bound by a trust, has come into the hands of persons bound to preserve it for the trust.   But that is a *petitio principii*.   It must have come into the hands of a possessor of it without value given or notice had, else he may hold it against the world.   If he received it with notice of the trust, he received it *mala-fide;* if he gave nothing for it, he received it without consideration; and in either case he must refund; but unless he received it affected by the one circumstance or the other, he did not receive it bound by the trust.   Every text-writer tells as much.   Now the respondents had not notice that the money received by them as preferred creditors, might have been demanded by them as trustees for the general creditors; and they gave value for it.   The voluntary trust was in successful operation, and opposition to it had ceased, at least for a time, and it was not probable that it would be renewed.   It has been argued that it was kept afoot by the respondents' own action.   The less reason, then, to charge them with supineness.   But if it were so, the voluntary trustees should have been held liable in it, and the other preferred creditors should

have been compelled to refund. But trust money cannot be followed into the hands of one who received it *bona fide*. It may be followed into land purchased with it, but not into the pocket of the vendor, who gave the trustee an equivalent for it. In this case, the distribution was made when an adverse trust was not known to exist; and the respondents were practically ignorant of it. With Fassit and Phillips, the voice of the general creditors had died away; and though Eustace gave notice of opposition in eleven days, and Mr. Fallon in thirteen, no defensible ground was taken before the decision in Hennessey and the Western Bank after the lapse of almost four years. *Steward vs.* Minier established that *bona fide* acts, completed under an unsound voluntary assignment, cannot be revoked; and in this case the act of payment was completed in good faith. It was bought with a price before the general creditors, who now contest it, had raised a finger against it. They had purchased their pittance by releasing their debt. The transaction could be unravelled only by treating payment to them in their character of preferred creditors, as a turn over of the money to them in their character of trustees, and thus falsifying the very nature of the act. Equity will turn a fraudulent party into a trustee, where it is necessary to do so in order to reach him; but not a party whose acts have been fair and conscientious. We are of opinion, therefore, that the respondents are not accountable for any part of the moneys with which it has been sought to charge them.

Decrees affirmed.