## Benscoter Estate

*Roland O. Brockway,* for accountant.
*R. L. Coughlin* and *Raymond Lowery,* for exceptant.

HOURIGAN, P. J., April 8, 1948.—Before the court are exceptions to the second and final account of Roscoe H. Benscoter, executor of the estate of Sarah C. Benscoter, deceased.

Sarah C. Benscoter died testate on December 25, 1932. Letters testamentary issued to Roscoe H. Benscoter. The estate consisted of personalty and real estate. A first and partial account of the personalty was filed on July 12, 1933, and confirmed absolutely on September 15, 1933. The account was duly audited and distribution made. There was returned to the executor for further accounting the sum of $1,000. Thereafter, the real estate was, with the balance of personalty, all that remained to be disposed of.

The second and final account was filed on January 16, 1948. In it the executor accounts for the balance of personalty and sales of real estate and lumber.

The principal objection to the account is that the executor, without authority under the will, converted timber standing upon the real estate to lumber and sold it as lumber. Exceptant contends that such conversion amounted to the conducting of a business personally by the executor, and that he is now liable for the value of the timber as of the time he started cutting and selling it. With this contention we do not agree.

The will provides: "(10) It is my express desire and request that my executor, whenever he may need legal advice and assistance in the settlement of my estate, or in carrying out the trusts and purposes of my will, shall consult and employ Roland O. Brockway, Esq., of Berwick, Pa., he having an intimate knowledge of my affairs and of my views and wishes in many matters that may arise in the settlement of my estate. . . . Lastly—I nominate, constitute and appoint Roscoe H. Benscoter, Executor of this my last will and testament, hereby conferring upon my said Executor power at any time to sell any real estate which may at any time form part of my estate for such prices, upon

such terms, in such way and manner and for such interests and estates as may be deemed wise and to make good deeds therefor, to the purchasers thereof, without any obligation on the latter to see to or be responsible for the application of the purchase money."

The executor, as directed in the will, consulted, employed and followed the advice of Mr. Brockway, a competent lawyer.

The executor made several unsuccessful efforts to sell the real estate and standing timber. Decedent died in the midst of one of the worst depressions this nation has ever had. About 15 months after decedent's death every banking institution in this country was closed by order of the President of the United States. All fiduciaries at that time were under heavy and disheartening burdens.

The executor endeavored to promptly fulfill his duties. This is best proven by the expeditious manner in which he disposed of and accounted for the personal property. He offered the real estate for sale but could find no buyers which was perfectly natural because of the economic conditions.

A large part of the real estate was situated on a small body of water known as Benscoter's Pond. The executor had that property surveyed and plotted into building lots and changed the name of the pond to Sylvan Lake. He was successful in selling these lots— at the present time all are sold.

The timber was a more difficult problem for him. For the purpose of disposing of this timber he contacted men who bought and sold timber. The best cash offer made to him was by Charles Wildoner who offered $2,300 for all standing timber. The Davis Mill Company of Forty Fort, Pa., offered him $15 per thousand if he would cut the timber and deliver it at Forty Fort, Pa. He knew this could not be done without a loss. Others were contacted but would not buy or make an offer for the timber. Following attorney Brock-

way's advice, as he was directed to by testator, he cut the timber, processed it into lumber and ties and sold it. It amounted to 724,000 board feet.

The testimony shows that most of the lumber, after processing, was second and third grade. The testimony shows that the tract had not been taken care of—woodpeckers had drilled the trees full of holes—much of it was hollow-centered or doty. Because limbs were not cut out as the trees grew the lumber was full of black knots. A large portion of it was in a swamp and had reached an age when it should have been timbered.

From the sale of this lumber, 724,000 board feet, the executor received the total sum of $19,694.69. The total cost of processing the timber into lumber and ties was $14,169 which produced a profit of $5,525.69.

We are of the opinion that the executor acted in good faith, under advice of counsel as directed in the will, and did all that a reasonably prudent and cautious man could do in the administration of this estate, and got, under the circumstances, the best prices obtainable for the real estate and the timber.

The executor followed the direction of testator. All things done by him in connection with the sale of the real estate and the timber were in accordance with advice given to him by attorney Brockway.

There is no question about an executor's responsibilities under these circumstances. The law is laid down by Mr. Justice Patterson in Kohler Estate, 348 Pa. 55 at p. 58, as follows:

" 'Where a guardian or other fiduciary acts in good faith under advice of a competent lawyer, he is not liable for mistakes of law, if such there be, or for errors of judgment': Dempster's Estate, 308 Pa. 153, 158. See also Riebel's Estate, 321 Pa. 145, 149; Henry's Estate, supra, 447; Kline's Estate, 280 Pa. 41, 44."

In Keller's Appeal, 8 Pa. 288 at p. 289, Judge Coulter said:

"It must be borne in mind that the office of administrator, executor, and guardian, is one of the highest and most absolute necessity in society; and in a great majority of cases is undertaken more out of kindness and duty, than with any hope or expectation of emolument, and is attended in its faithful discharge with trouble, anxiety, and hazard.

"In the case of Knight v. Earl of Plymouth, 3 Atk. 480, Lord Hardwick observes: 'If there is nothing wilful in the conduct of the trustee, no *mala fides*, the court will always favour him. To subject him to losses which he could not foresee, would be manifest hardship, and would be deterring every one from accepting such an office.' . . ."

In Bradley's Appeal, 89 Pa. 514 at p. 521 (1879) the court said:

"There is a line of authorities which hold that trustees who have acted in good faith, and under the advice of counsel, are not responsible for a mere error of judgment, or a mistake of law. It is sufficient to refer to King v. Morrison, 1 P. & W. 188; During, King and Miller's Appeals, 1 Harris 224; Neff's Appeal, 7 P. F. Smith 91, and the Savings Fund's Appeal, 26 Id. 203. Trustees must of necessity seek the advice of counsel in the performance of their duties. Not to do so would, in many instances, be gross negligence. It would be a harsh rule to require trustees to seek legal advice, and then hold them responsible for an error of law committed by their counsel. In the language of Chief Justice Gibson (1 Harris 235), it 'would throw the execution of trusts into the hands of knaves or fools'."

In Stirling's Estate, 342 Pa. 497, 503, Justice Linn said:

"Our cases leave no uncertainty of the effect of the advice of counsel in such circumstances. The subject

appears first to have been considered in *During's Appeal*, 13 Pa. 224, 233, in which Chief Justice Gibson said: 'When a trustee has to steer his course among the rocks and shoals of his duty, he would be justly chargeable with the consequences of disaster, did he reject the services of a professional pilot, and act of his own head. He would be guilty, so to speak, of official barratry. On the other hand, he would not be answerable for losses induced by the incompetence of the pilot.' Subsequent cases referring to the rule are numerous, the latest being Henry's Estate, 341 Pa. 439, 1941. [Footnote cites the following: Scott: Trusts, section 201. Bradley's Appeal, 89 Pa. 514, 521; Dempster's Estate, 308 Pa. 153, 158; Riebel's Estate, 321 Pa. 145, 149; Wanamaker's Trust Estate, 340 Pa. 419, 422.] In considering the effect of Judge Galbreath's advice to the executors, it is first to be noted that testator appointed him, 'should an attorney be required in connection with the settlement of my estate'. If counsel erroneously construed his own composition, in advising the executors, the court would not be required to repeat the error by accepting the mistaken interpretation, but the fact that he was 'appointed' by the testator for the purpose, was retained by and advised the executors, as he did, are evidence to be considered by the trier of fact who must determine whether the Trust Company applied the required measure of care in the administration of the trust."

When letters testamentary issued the value of the real estate which included the timber was fixed, under oath in the petition for letters, at $10,000. The real estate for inheritance tax purposes was assessed and taxes paid upon a value of $15,000. The account presently before us shows the balances for distribution as follows: Real estate, $14,699.19; lumber, $5,525.69, or a total of $20,194.88—twice the value fixed in the petition for letters testamentary, and at least one

third more than the value upon which inheritance taxes were assessed and paid.

Under the facts and the law applicable to them the exceptions are dismissed; and, now, April 8, 1948, the account is confirmed absolutely.