## Luria Trust

*David Berger, Cohen, Shapiro, Berger, Polisher & Cohen; Harold Berger, Berger and Stein; Donald S. Cohan, Dilworth, Paxson, Kalish, Kohn & Levy, for* exceptant.

*H. Robert Fiebach, Louis J. Goffman, Morris H. Goldman, Wolf, Block, Schorr and Solis-Cohen,* contra.

### ADJUDICATION

SAYLOR, J., March 14, 1968.—Dorothy F. Luria (later Dorothy Luria Mintz) executed on December 9, 1939, as of October 3, 1939, an irrevocable deed of trust wherein she named herself as life tenant with a special power of appointment during her lifetime and a power to appoint the principal by will. She named as her trustees her four brothers: Herbert B. Luria, William Luria, I. David Luria and Henry T. Luria. They and a fifth brother, Mortimer F. Luria, were likewise

parties to the deed as settlors and life tenants, together with their mother, Sadie Luria, widow of Max Luria, who had died on September 9, 1939. This deed was executed "in order to safeguard the mutual interests of the settlors by consolidating all of their property", it being the intention of each respective settlor to establish a separate trust of his or her own principal under one trust instrument.

The deed before the court was executed in succession to, and revoked, deeds of trust created by Max Luria for his six children in 1920, 1923 and 1926. It continues as to Mrs. Mintz.

Counsel for Mrs. Mintz have stated to the court that the 1939 trust was part of a relationship set up by Max Luria's children to carry out his daughter's intent.

Dorothy Luria Mintz filed objections to the administration of her trust by her brothers, which objections may be divided into two categories. The first concerns alleged violation of what may be called the "equal and exact treatment" of the seven trusts established by the deed. The second category consists of charges of lack of reasonable care, failure to act fairly with the trust and disloyalty shown by the brothers as trustees in dealing with their sister.

Hearings were held from time to time, commencing on May 11, 1964, and concluding on October 4, 1967. Counsel appeared in court on 18 occasions; testimony was taken on 14 days. A total of over 900 pages of testimony and numerous exhibits constitute the record. The protracted course of the lititigation was due in part to delay of counsel in producing witnesses, in part to illness of Mrs. Mintz and in part to continuing efforts of the parties to achieve a settlement. Throughout months and years these efforts were made with the result that settlement was agreed upon by counsel. Despite expectations that it would be accepted by the

objector, Dorothy Luria Mintz, the proposed settlement was declined.

During the litigation the trustees filed, on May 11, 1964, and on October 4, 1967, memoranda of additional debits and credits.

The account was filed by Herbert B. Luria, William Luria, I. David Luria and Henry T. Luria, as stated by William Luria, I. David Luria and Henry T. Luria and by the executors of the will of Herbert B. Luria, a deceased cotrustee. It was filed because of the death of the said Herbert B. Luria, a cotrustee. By Article XI of the deed of trust it is provided that whenever less than four of the original named trustees are acting, Mortimer F. Luria and Dorothy T. Luria (Mintz) shall in that order succeed to the office of trustee. Accordingly, Mortimer F. Luria becomes a cotrustee in place of the said Herbert B. Luria, deceased.

Before discussing the various objections before the court it is necessary to give careful consideration to the circumstances surrounding the creation of what is known as the Max Family Trust and its administration. Involved are the activities of the members of three branches of a closely-knit family, headed respectively by three brothers, Max, Alec and Abe Luria, all of whom were actively engaged in the business of trading in scrap iron and steel and nonferrous metals since the enterprise was started by their father in 1889. The securities issued by Luria Brothers and Company (hereinafter referred to as Luria Brothers) were the principal assets of the Luria family.

By 1935, Luria Brothers was firmly established as a scrap metals brokerage concern. Max's family and Alec Luria each owned 44½ percent of the outstanding stock of the company. The family of the deceased brother, Abe Luria, owned the remaining 11 percent. Alec Luria, as trustee of Abe Luria's estate, controlled these shares and thus controlled the com-

pany. Hence, the two dominant groups were the Max Luria and Alec Luria families. The heads of these families were actively and almost exclusively involved in the operation of the business upon the success of which the Luria family depended for its income.

Of Max Luria's five sons, four were engaged in operating the company. Alec had only one son, also named Herbert, so engaged. Nonfamily individuals held important positions in the business and were competing for recognition. Friction developed between the two groups as Max was naturally ambitious for the continued advancement of his sons to the possible detriment of the nonfamily employes.

A family division developed before Max died in 1939. In his will, executed in 1935, he called for harmony between his sons and his brother Alec, stating, inter alia, that it was to the best interest of his children that they and Alec's family have "nothing but the most complete understanding and agreement" so that the business the two brothers had built continue to be "successfully administered and developed by our successors".

In 1935, the two brothers created Luria Steel and Trading Company (hereinafter called Luria Steel), Alec agreeing that the new company could be developed for Max's sons. It commenced operations in 1937 and handled all of the foreign export and brokerage business of Luria Brothers. Four of Max's five sons left that company for the new one. William remained with the older company until 1945, when a separation of the two families' interests was made, as hereinafter set forth.

The 1935 arrangement lessened friction, but on Max's death in 1939 it developed once more. There was thereupon created the Max Family Trust which consolidated all of Max Luria's family's property in order to centralize control in the hands of the Max

Luria Family trustees, as first above stated.

Under the leadership of Max's eldest son, Herbert B. Luria, efforts were made to conduct the business harmoniously with Alec and his family. These efforts resulted in the execution of a so called "Harmony Agreement", prepared by D. Hays Solis-Cohen, Esq., who had served both families as personal counsel since 1930.

This agreement, executed on September 10, 1940, and binding upon all members of both families, gave to Max's family the right to "put" to Alec the Luria Brothers shares they owned and, conversely, gave to Alec the right to tender all of the Luria Steel stock he owned as part of the purchase price for Luria Brothers stock, any difference to be paid in cash to the Max Luria family. Dorothy, who was then 27 years old, her brothers and her mother signed the "Harmony Agreement" which recognized the division of the interests of the Max and Alec families.

There followed little friction between the families. However, in December 1944, a situation occurred which threatened disaster. Six so called "key" employes of Luria Brothers, fearing that in the event of Alec Luria's death the sons of Max Luria would again dominate the company and control its affairs, cast a bombshell into the Luria ranks by sending in letters of resignation.

The country was then at war. Three of Max's sons were in the service. Alec was in Florida. Something had to be done quickly. A meeting of the six employes and representatives of the two families was arranged by Mr. Solis-Cohen at the Ritz Carlton Hotel, which meeting he attended. Throughout the night of December 28-29, 1944, efforts were made to reach an agreement. Alec Luria insisted that the "key" men remain in the business or he would move for its liquidation.

At 3 a.m. on December 29, 1944, an agreement was reached. Mr. Solis-Cohen wrote down the terms which Alec said he would sign only if (1) the "key" men agreed to stay with Luria Brothers, and (2) he could borrow the funds necessary to pay for the stock of the company owned by the Max Luria family. Forthwith an emergency meeting of the company directors was held, the minutes of which recite the events that had occurred and the conferences that had been held and the result thereof. These minutes show that the "key" men would remain with Luria Brothers only if Max Luria's sons, with the exception of William, left its active management. This caused Herbert B. Luria, then the head of the Max Luria family, to refuse the relinquishment of his family's right to participate in management decisions as long as their investment in the company continued. He stated that the company could be operated successfully without the affected employes. Alec Luria took the contrary position.

Further negotiations were necessary. Three courses of action were possible. There had to be liquidation of the company or sale of Max Luria's family's interest therein or purchase by that family of all the issued stock of the company. The agreement that was finally reached called for the sale by the Max Luria family of its 6,000 shares of Luria Brothers stock to Alec Luria for $350 a share, which was $107 more than its book value, and the purchase by the Max Luria family of Alec Luria's stock in Luria Steel at $216.31 per share, which was the book value.

Furthermore, Luria Brothers was to purchase for Alec Luria 3,250 shares of the company from the Max Luria family by lending the necessary funds. Alec Luria insisted that there was otherwise no alternative to liquidation. The directors of the company authorized the purchase, and final agreement was reached.

It was immediately reduced to a written agreement dated January 2, 1945.

The Max Luria family purchased Alec Luria's 1,200 shares of Luria Steel at the book value of $216.31 per share. These shares were divided equally among the trusts for the six children, which increased each trust's investment therein from 100 to 300 shares. The Max Luria family received for its 6,000 shares of Luria Brothers $2,100,000, to be paid in installments after deducting the cost of the 1,200 Luria Steel shares. As the latter at book value cost Alec Luria $259,572, the net cash due his brother's family was $1,840,428. By virtue of the sale to Alec Luria, his brother Max's family received over $641,000 more for its holdings in Luria Brothers than it could have realized had the two companies been liquidated, as testified by an investment counselor and not disputed.

The trust for each of Max Luria's children received $187,000 in cash and an equal share of the Luria Steel stock that had been purchased, all shares of that company's outstanding stock having come into the possession of Max Luria's family.

The business interests of the Max and Alec Luria families having been separated, the problem then before the Max Luria family for solution was that of making their company, Luria Steel, strong and prosperous, as it had been reduced to little more than a corporate shell as a result of the war that ended in 1945. Obviously, it needed additional capital. Much money had to be invested in the company to build it up to such a size as would make its operation profitable. That meant that the cash received for the Luria Brothers stock had to be used for that purpose. The brothers forthwith invested $625,000 in stock of the company. No difficulty was present for the sons of Max Luria to devote their funds in such manner, but as the scrap metal business is notoriously at all times a

hazardous one, and as Luria Steel was in less than robust financial condition at the time, it was found to be most inadvisable to invest the money of Dorothy Luria Mintz in the corporate stock as it was not then prudent to invite an equity risk.

The deed of trust of December 9, 1939, provides under "I. CORPUS" as follows:

"The corpus of each respective trust consists of the property herein or hereinafter conveyed by each respective settlor in trust. The cash may be held uninvested or invested as hereinafter directed. When investments are purchased by the Trustees, the same investment shall be bought for each Trust, and the amount invested for each trust shall be equal. When securities are sold, they shall be sold equally from each trust".

Before making the investment of Dorothy's funds in Luria Steel her trustees consulted Mr. Solis-Cohen in his capacity as attorney for the members of the Max Luria family. After receiving his advice, the trustees refrained from investing any funds of Dorothy's trust in Luria Steel stock, and instead purchased $5,000 face value of United States Treasury bonds and $90,000 face value of debentures of Luria Steel with an interest rate of 6 percent. This interest rate was more than double the average yield of other bonds then available in the securities market. These bonds or debentures were subordinated to loans made by banks or other financial institutions, but, of course, were an obligation or debt of the company and therefore would have to be paid before any distribution could be made on stock holdings in the event of liquidation of the company. No such debentures were purchased by the other trusts.

They were purchased to the extent of $625,000 by the executors of Max Luria's will. Substantial income was necessary to pay Dorothy an annuity of $5,000 and

her mother an annuity of $15,000, plus another $15,-000 if the income was adequate. There was power given by the will of Max Luria to invade principal to pay the annuities in full. But by the creation of the debentures of the family company yielding interest at six percent annually, it was possible to protect principal. It was testified that the sole purpose of creating the debentures was to provide such income with security of principal for Sadie Luria and Dorothy.

Dorothy Luria Mintz has objected to the actions of her brothers as trustees in (1) selling the Luria Brothers stock held in her trust; (2) investing her assets in Luria Steel debentures rather than in its common stock to the same extent that the trustees invested assets of the brothers' trusts in such stock; and (3) other actions for which she contends they should be surcharged. Dorothy claims damages due to the sale of dividend paying stock in 1945 and investment of the proceeds of such sale in what she characterizes as "high-risk subordinated notes". Coupled with this objection, is the charge that her trustees should have invested trust assets in the common stock of Luria Steel (which has not paid dividends) and thereby complied with the deed provisions hereinabove quoted.

### Sale of Luria Brothers Stock

The objector claims very substantial damages because she charges that her trustees should not have sold her Luria Brothers stock at $350 a share in 1945 for the reason that, had they held it, eventually it had far greater value, as it was said that the company was later sold for $20,000,000. This claim is without any legal basis whatever.

The trustees' agreement with Alec Luria providing for the sale of the trust's investment in Luria Brothers stock was justified because of the extreme urgency of

the situation existing in December 1944. Had that arrangement not been made, as above set forth, there might have occurred a disastrous loss to Dorothy's trust because had Luria Brothers been liquidated her trust's holding of 500 shares would have been worth far less than $350 a share, the price Alec Luria paid for each share, a figure $107 in excess of the book value at the time of the transaction. No bad faith can be imputed to the trustees in taking the action that resulted in a profit to each of the trusts.

Then, too, their prior action in equalizing their sister's interests with their own in the several trusts by brothers Henry T. and I. David Luria contributing a total of $13,400 to Dorothy's trust, is patent evidence of their good will and their desire to deal fairly with her. The result of this generosity was that, with the exception of Sadie Luria's trust, the assets of the other six were identical. That is to say, each trust of the six siblings possessed $39,300 in cash, 500 shares of Luria Brothers, 100 shares of Luria Steel, and additional investments of another kind. It was only after the sale of the Luria Brothers shares that inequality in character and quantity of the investments in the several trusts of Max Luria's children was created.

The agreement of January 2, 1945, for the sale of the Max Luria family stock in Luria Brothers to Alec Luria was entered into by the executors of Max Luria's will and by all of the trustees of the Max Family Trust. It is inconceivable that Dorothy was either unaware of it or that she had any objection to it.

It has been testified, without contradiction, and it is found as a fact, that the Max Luria family was a closely knit group, that the brothers had always looked after the women of the family, that the father had educated the two women to rely on the brothers, that he had taught the younger sons to rely on the judg-

ment of their oldest brother, Herbert, and that Herbert, at that time a bachelor, looked after his mother and Dorothy. So testified Mr. Solis-Cohen who had since the early 1930's been counsel to the Max and Alec Luria families, which of course included Dorothy. The testimony concerning weekly visits made by Herbert Luria to his mother and his sister at Ventnor, New Jersey, and his discussion with them of the investment of their funds after the sale of their Luria Brothers stock is evidence of the knowledge by Dorothy at that time (1945) that her trust's Luria Brothers stock was being sold as stated in the agreement of January 2, 1945. Not until the audit of the account now before the court was any protest against the sale made by Dorothy or by anyone on her behalf.

By making the sale to her Uncle Alec her trustees created a very substantial profit for her, and this she must have known and realized in 1945, at which time she said she was aware of the transaction. In 1945 she was 32 years old and sui juris.

In the face of that fact and of the testimony of her mother, Sadie Luria, that Dorothy was present when her brother Herbert visited her in Ventnor and there explained what he and his brothers had done, there can be no conclusion other than that she acquiesced in the sale by the trustees of the Luria Brothers shares held by her trust.

The trustees' action was unquestionably necessitated by the challenge made by the six "key" employes to leave the company and the demand of Alec Luria that unless they remained, and unless the Max Luria boys left the business, he would force its liquidation. Had liquidation resulted, Dorothy's estate would have suffered a grievous loss. Instead it realized a considerable profit because of the sale. The trustees acted under the authority of Paragraph IX of the deed of trust which gave them the power to dispose of the

stock with the consent of all the trustees, and all trusts were treated equally. Moreover, as Dorothy executed the family agreement of September 10, 1940, she then knew of the family differences and then recognized that ultimately there could, and likely would, be a family division.

The agreement entered into by the trustees on December 29, 1944, and made formal on January 2, 1945, was a family agreement, which the law favors, and when fair is valid and will be upheld wherever possible: Fry v. Stetson, 370 Pa. 132 (1952); Edelman's Estate, 336 Pa. 4 (1939); Iacovino v. Caterino, 332 Pa. 556 (1938).

Dorothy admitted knowledge of that agreement. She did not object to it when made. Not until after the trustees' account was filed and she had consulted counsel other than Mr. Solis-Cohen did she raise any objection to what her trustees had done nearly 15 years before. She can not now disclaim approval: MacFarlane's Estate, 317 Pa. 377 (1935). Her participation in the "Harmony Agreement" of 1940 bars her from charging her brothers with self-dealing: Landis Trust, 382 Pa. 486, 494 (1955). Neither morally nor legally is there any validity to this objection.

*Investment in Luria Steel Debentures*

The objector's counsel's position on this portion of the charges made by them in her behalf against her trustee brothers is altogether contradictory. Throughout this litigation they have referred to the Luria Steel debentures as unsecured notes, as high-risk investments for trust funds. At the same time they urge the court to penalize the trustees for failure to invest trust assets in the company's common stock. If the debentures, a debt of the company subordinated only to loans made by banks or other financial institutions, are considered by them as "high risk" or as "investments with non-existent liquidity", as stated in coun-

sel's briefs, despite a record of uninterrupted payment of six percent interest since 1945, how is the court to consider the nondividend paying stock of the company other than as a higher risk investment? With one breath the trustees are criticized for assuring their sister a steady and secure income of six percent, and with another breath they are criticized for not investing her trust assets in shares of stock which have not paid a dividend since 1945. And even more confusing and conflicting is counsel's argument that permitting the retention of their client's minority interest, which her trust's 300 shares of Luria Steel represented, was a breach of trust because the stock paid no dividends.

In defense of their action in making an investment that assured their sister regular income, while at the same time it helped to finance their family enterprises, of which their sister was a part, the brothers say that they relied on the advice of counsel and acted as they did with the knowledge and consent of their sister.

First of all, Mr. Solis-Cohen advised the trustees that in his opinion the investment in debentures for Dorothy's trust and not for their trusts was not in violation of the indenture's provisions. Counsel said that Max Luria had always distinguished the family holdings in the Luria business enterprises as investments distinct from those made outside such enterprises. Hence it was not required by the trust instrument that cash available in the several trusts had to be invested in equal amounts for all of them where such investment was in the family business, namely, in Luria Steel.

It can be argued properly and fairly that this opinion runs counter to the sense of the quoted paragraph of the deed and that the language thereof does not support the interpretation Mr. Solis-Cohen gave it. Nor does the reading of another paragraph of the

deed, in conjunction with that quoted, produce the conclusion that counsel reached as evidencing the intention of the parties to permit what actually occurred.

Article IX of the indenture provides:

"The stock of Luria Brothers & Company, Inc. and Luria Steel and Trading Corporation deposited in Trust hereunder or any securities for which the same may be exchanged by reason of any merger or consolidation of either or both of the companies by which they have been issued, shall be retained by the Trustees hereunder and not be disposed of except with the consent of all the acting Trustees hereunder until the death of the last surviving of the original settlors".

However, there were other far more compelling reasons for counsel's advice. The brothers worked for the company and were being paid for their services. The sister and the mother did not work for the company and received no salaries. For them it was important that there be an assured and adequate income paid to them regularly. Investment of their funds in evidences of debt rather than in equities of the company was necessary. By purchasing the stock of the company the brothers not only gave it financial strength but also created a cushion, so to speak, that secured more firmly the base upon which the debentures rested.

The only sources of income for Dorothy and her mother were the Max Luria Estate and the Max Luria Family Trust. It would not have been to their best interest had their trust funds been invested in nondividend paying stock. Hence, Dorothy's trust investment in Luria Steel stock remained at 300 shares.

The procedure followed by the trustees was based on the reasons recited. While that procedure appears to be contrary to that prescribed by the trust indenture, it was considered by the trustees to be proper in view of the advice of their counsel and the radical

change in conditions between 1939 and 1945. They did not act in bad faith. They followed the advice of the competent lawyer who at that time was counsel for all members of the Max Luria family.

Paragraph II(j) of the indenture authorized and empowered the trustees

"To retain and pay counsel for advice or other professional services . . . being responsible only for due care in the selection of such persons, and generally to have all such general and particular powers as may be necessary or convenient to enable Trustees to attend to all the business of the Trusts in the most direct and efficient way, without being required to apply to any Court and without being hampered by personal liability for unfavorable results for any action taken in good faith and with such care as a reasonably prudent businessman would ordinarily take in the management of his own private affairs".

There is no charge that Mr. Solis-Cohen, an able and respected member of the Philadelphia bar, was negligently chosen. He gave the trustees his opinion that it would be imprudent to invest a substantial portion of Dorothy's trust assets in the equity of a highly speculative business. The trustees acted upon such advice in good faith and in so acting did not become liable for mistakes of law or for errors in judgment, even if errors there were: During Appeal, 13 Pa. 224 (1850); Bradley's Appeal, 89 Pa. 514 (1879); Dempster's Estate, 308 Pa. 153 (1932).

Advice of counsel concerning legal interpretation is a bar to any claim that the trustees' action was either illegal or not permitted: Kohler Estate, 348 Pa. 55 (1943); Wanamaker's Trust Estate, 340 Pa. 419 (1941); Estate of Rebecca Cridland, Deceased, 132 Pa. 479 (1890); During Appeal, 13 Pa. 224 (1850).

Advice of counsel relating to investment judgment relieves the trustees if their action was prudent and

the judgment was exercised in good faith: Guthrie's Estate, 320 Pa. 530 (1936); Vandergrift Estate, 406 Pa. 14 (1962).

The trustees' reliance on Mr. Solis-Cohen's legal opinion that the investment clause did not apply to Luria securities relieves them of liability for deviating from it. Their reliance on counsel's advice that it would be imprudent to invest Dorothy's trust assets in Luria Steel common stock is evidence that the trustees acted not only prudently, as events have proved, but also in good faith. They were motivated by their desire to act in Dorothy's best interest, to safeguard her trust principal and to provide for her an adequate income.

It was not a case of procuring $90,000 for Luria Steel by unloading company debentures on Dorothy's trust. Luria Steel could have borrowed the same amount from banks at a far lower rate of interest. For the same reason that the executors of Max Luria's will purchased the debentures, the desire and purpose of the brothers was to secure for mother and daughter a six percent return on their money and to continue their interest in the business of the entire Max Luria family, of which they were a part.

Dorothy was dependent on the $5,000 annuity established by her father in his will and on the $5,400 a year from the trust investment in the debentures. As a divorcee she receives alimony of $10,000 annually. Even so, she has requested and received during this litigation substantial advances from principal of her trust estate for her personal needs. This demonstrates that she has required a steady supply of income. As her counsel stated, "She was always needing money". Had her funds been invested in the stock of Luria Steel to the same extent as her brothers' trust funds were invested, her income from the trust would have been negligible. In the actual event she received six per-

cent interest when other obligations were paying only three percent, or less.

The first duty of the trustees was to insure safety of the trust principal. The second duty was to provide income for the life tenant. In no event could they speculate with the trust funds: Heyl's Estate, 331 Pa. 202 (1938) ; Hart's Estate (No. 1), 203 Pa. 480 (1902) ; Wood's Estate, 130 Pa. Superior Ct. 397 (1938).

The debentures were originally due and payable April 30, 1965. They have not been paid for two reasons: (1) the proceeds could not have been invested at as high an interest rate as six percent, and (2) this litigation so vitally involving them as trust investments was in progress at the date of their maturity. The obligor, Luria Steel, is ready and willing to redeem the debentures now. There has been no loss on the investment and none appears likely.

In any event, Dorothy has not produced any evidence of loss resulting from the action of her trustees in failing to invest her trust assets in Luria Steel common stock and thereby deviating from the provision of the trust indenture. She has not proved that she has suffered any money damages. Actually, she is foreclosed from justifiably complaining, many years after the event, of the procedure followed by the trustees for the reasons which at the time were made evident to her as settlor and life tenant.

Herbert B. Luria, the acknowledged head of the family following the father's death, the paterfamilias to whom, as his brother Henry T. Luria testified, all members of the family without exception looked as his father's successor, as heretofore stated, informed his mother and his sister at Ventnor of the trustees' decision to invest her trust assets in debentures and not in the common stock of Luria Steel, the family enterprise.

Herbert B. Luria died in 1958. He could not be called by his brother trustees to testify in their behalf. His mother, Sadie, survived him. She testified by deposition concerning what happened at Ventnor in 1945. She said that her son Herbert told her and Dorothy (1) that he and his brothers were investing their funds in the family business, but because he was afraid his mother and sister would lose if it did not succeed their funds were being invested in government bonds and debentures of the company and (2) that Dorothy was quite satisfied.

The testimony of Dorothy's mother must be given great weight. Sadie Luria said in her deposition that she loved all of her children equally. That in her will she treated them all equally is evidence of that fact.

Dorothy herself has testified that in 1945 she knew of this transaction and was in the Ventnor house with her mother when Herbert came there. Nevertheless, she said that Herbert never discussed business with her and that she was completely unaware that her trust funds were invested in debentures. She said that she never asked for an accounting because she "trusted her brothers" and that she first became aware of various matters complained of when she consulted counsel. When asked if, when she wanted to complain about anything, she had any hesitancy in telling her brothers, she answered "I always said what I thought". Dorothy was an evasive witness. Her statement that she "did not know", several times repeated, raises doubt as to her testimony.

Dorothy received regularly the six percent interest due on the debentures, together with periodical statements from certified public accountants, and knew, or at least ought to have known, that her trust income came from Luria Steel debentures and government bonds and in no way whatsoever from her 300 shares of common stock.

In 1958, over 13 years after the challenged investments were made, Dorothy's acquiescence barred her objection thereto. She is estopped from complaining now: Wilbur's Estate, 334 Pa. 45 (1941); Ward Estate, 350 Pa. 144 (1944); Macfarlane's Estate, 317 Pa. 377 (1935); Lieber's Estate, 342 Pa. 246 (1941).

Moreover, the doctrine of laches raises another bar to Dorothy's objection. There are present here many of the factors which must be considered in determining whether she is precluded from challenging the investments. She had reason to know of the breach of trust, if one there had been, and she was not under any incapacity. Her interest in the trust existed throughout the period from its beginning in 1939 and through the year 1945, and she made no complaint until 1958. She has given no good reason for her delay in doing so. A most important witness, Herbert B. Luria, died before any complaint was made and hardship would be visited upon the surviving trustees were this court to give relief to her as requested. See Restatement, Trusts 2d, §219(1) and Hartman's Estate, 38 D. & C. 310 (O. C. Phila. Co., 1940).

Mere assertion that she "did not know" is inadequate. If she did not know she could and should have known long before 1959 because as a life tenant with a general power of appointment by will she had an estate equivalent to a fee and should have been diligent to complain promptly if in disagreement with her trustees: Taylor v. Coggins, 244 Pa. 228 (1914); Hartman's Estate, 38 D. & C. 310 (O. C. Phila. County 1940).

The death of the family head, the trustee to whom Dorothy looked for advice and the principal participant in securing counsel's opinion regarding investments, has caused a substantial change of position in the relationship of life tenant to trustees when a charge of bad faith and breach of trust is raised by the

former: Bangert v. Provident Trust Co., 314 Pa. 442 (1934).

Furthermore, had the trustees known long ago that their sister had any objection to their action in investing in debentures rather than in stock which circumstances, prudence and advice of counsel called for, they could have terminated the trust. Article III of the trust indenture provides:

"Each Settlor does hereby expressly declare that the trust which he or she is creating shall be irrevocable but the Trustees may at any time terminate the trust as to any Settlor provided only that such termination shall be by unanimous consent of the Trustees."

Incidentally, it was under that power that in 1950 the brothers' trusts were terminated by unanimous action of the trustees. Dorothy's complaint that she was not notified of that action until 1957 is not justified, as she provided such power when she executed the deed of trust.

Had the trustees made an investment for Dorothy in the common stock of Luria Steel equal to that made by the trustees for her brothers' trusts and thereby shown an increase of trust assets by virtue of the increase in value of shares of that stock over the years since 1945, there would not be any increase in the actual value of the trust assets because Luria Steel is a family-controlled closed corporation. There is no market for such stock. Besides that, throughout the period during which the trust would have held shares in an amount equal to the brothers' holdings there would have been no income by way of dividends therefrom, and Dorothy needed income. In addition, to have purchased the 1,025 additional shares to equalize Dorothy's holdings with those of her brothers it would have been necessary to sell debentures and United States Treasury Bonds and to the proceeds thereof add cash

in an amount sufficient to make available over $150,000, with which to make the purchase. This would have been distinctly to Dorothy's disadvantage.

Dorothy has not affirmatively proven any act of bad faith on the part of her brothers. Her claim for surcharge against them for investing her trust assets in debentures rather than in the common stock of Luria Steel is denied.

### Stock Purchases By Trustees For Their Trusts

The objector's further contention is that her brothers violated the terms of the trust instrument in purchasing Luria Steel at $100 a share on May 1, 1945, while at the same time they made no similar purchases for her is without validity for several reasons. First, there was no cash on hand with which to pay for common stock, even had her trustees decided to ignore the advice of their and their sister's counsel not to do so. Second, the trustees were duty bound to invest safely and prudently and not to venture trust funds in a highly speculative business as heretofore stated.

Again, comment must be made on the fact that conditions with respect to the Max Family Trust were far different in 1945 than they were in 1939. The friction that developed between the two families of Max and Alec Luria, exacerbated by the threats of the six "key" men employed by Luria Brothers, effected a most substantial change in the character of the Max Luria family investments. The situation that existed in 1945 made it unwise and actually financially impossible for Dorothy's trustees to make the same investments and the amounts thereof equal for each of the trusts as was contemplated in 1939 when the trust was created.

It is the conclusion of the auditing judge that Dorothy's trustees did not violate the trust terms in not investing trust assets in additional shares of Luria Steel when their trust estate assets were so invested.

*Conflict of Interest*

The objector contends that as the trustees were officers and directors of Luria Steel they were guilty of self dealing with the possibility of conflict of interest and that they can be surcharged for violation of the terms of the trust.

From the outset Dorothy was aware of the close relationship that existed among her five brothers, her mother and herself, as members of a family financially involved in the operations of Luria Brothers and Luria Steel. Aside from being a member of a family which her one time attorney, Mr. Solis-Cohen, characterized as a "closely knit group", and aside from the fact that, as her brother, Henry T. Luria testified, the relationship between his sister and her brothers was a "happy, friendly, excellent one", Dorothy knew by the contents of her father's will and the two agreements of 1940 to which she was a party that her brothers, prior to and after 1945, were actively engaged in the business of the Luria Family, that three of them were executors and trustees of her father's will, and that they, as well as she, were all beneficiaries thereof. When she executed the deed of trust on December 9, 1939, she was fully aware that her brothers were directors and stockholders of the family companies, and in 1945 that they were officers, directors and stockholders of Luria Steel. It ill behooves her to come into court now and charge them with self dealing in such capacities while they are her trustees. She knew also that as a signatory to the "Harmony Agreement" she and her brothers had authorized the sale of the Max Luria family shares of Luria Brothers and their purchase of Alec Luria's shares of Luria Steel.

Whatever her charges, she has not borne successfully the burden of showing affirmatively that her trustees acted in bad faith and committed fraud in their administration of her trust. Landis Trust, 382

Pa. 486, 494 (1955); Pincus Estate, 378 Pa. 102 (1954); Steele Estate, 377 Pa. 250, 257-259 (1954); Flagg Estate, 365 Pa. 82 (1950).

As settlor of the trust, Dorothy created the situation of which she now complains. But even if she had not created it she has not proved that, because of any conflict of interest, the actions of her trustees amounted to bad faith and caused loss to her: Pincus Estate, 378 Pa. 102 (1954). There was no self dealing by her trustees in their purchase of the Luria Steel debentures: Flagg Estate, 365 Pa. 82, 90 (1950).

### Additional Objections

The objector charges the trustees with violation of their duty to deal fairly with the trust and to use reasonable care in making the trust property productive in instances involving actions constituting disloyalty to the beneficiary. They are the following:

(a) A loan of $5,000 by the trustees to Builders Structural Steel Company on January 9, 1940.

The principal of this loan together with interest in the amount of $5,700.21 was paid in full on February 27, 1960, as set forth in the memorandum of additional debits and credits. This fact was confirmed by the objector's certified public accountant. Whether or not it was proper for the trustees to lend money to Builders Structural Steel Company (presently Luria Steel Supply Corporation), the objector's estate has not suffered damage from such action as interest was calculated at the legal rate of six percent. The objector's contention that interest should have been compounded to the sum of $11,035.64 is not founded on the law. The estate was entitled only to simple interest, which it has received: Restatement, Trusts 2d, §207 (2).

(b) A loan of $6,516.67 by the trustees to the Estate of Max Luria, Deceased, on December 5, 1940.

This noninterest paying loan and similar loans in greater amount were made by the trustees of the es-

tates of the five brothers under authority of the Family Trust Deed giving the trustees in Article II (a) thereof power "to lend funds equally from each of the separate trusts to the executors under the will of Max Luria, deceased, with or without security". With such authority specifically given by the objector, she has no right to charge them with violation of duty. Actually, as the record shows, the amount of the loans by the trustees for three of her brothers, namely, Mortimer T., Henry T. and I. David Luria, were respectively $16,516.67. The loan by William Luria's trustees was for $10,000 and the loan by the trustees of Herbert B. Luria was for $10,516.66. Had the Estate of Max Luria paid interest on the loans to each of the trusts, Dorothy Luria Mintz would have received $2,713.21 less by way of income from that estate because she shared equally with her five brothers in distribution of income therefrom. The failure of that estate to pay interest to the objector's trust estate therefore gave her a net benefit.

(c) The objector contends also that the trustees used the assets of the Max Luria Estate for their own benefit in violation of the fifth and seventh paragraphs of the will by lending on March 6 and July 2, 1945, to Luria Steel, which they controlled, a total of $625,000 in return for 6 percent subordinated notes. As the executors and trustees of the Max Luria Estate held 350 shares and the trustees of the Max Luria Family Trust controlled the remainder of the 5,800 outstanding shares, the objector claims that the transaction was clearly a loan by the trustees to themselves to the exclusion of Dorothy through their use of a corporation from which they were deriving substantial salaries, expenses and other benefits, contrary to their fiduciary obligations.

The administrative acts of the executors and trustees of the Max Luria Estate are not the concern of

the court in auditing the account of the Dorothy Luria Mintz Trust. This is a matter upon which the auditing judge makes no ruling. Suffice it to say that any action taken by the fiduciaries of her father's estate respecting the financing of Luria Steel which became solely the property of the Max Luria family in 1945 created a benefit to Dorothy as her estate and the estates of her five brothers were all substantially interested in the welfare and future prosperity of that company. In view of the unchallenged fact that Dorothy Luria Mintz was a party to the agreements of September 10, 1940, and October 16, 1940, which preceded and anticipated in large part the consummation of the January 2, 1945 agreement, all of which agreements resulted finally in the members of the Max Luria family becoming no longer involved in the ownership of Luria Brothers but completely and exclusively concerned with the future success of Luria Steel, it is not possible to conceive of any detriment to the objector's estate that did or could emanate from the lending of Max Luria Estate funds to that company.

(d) There is an additional objection to the trustees' having sold the dividend paying Luria Brothers shares and purchased Luria Steel stock which was nondividend paying and which the trustees' financial expert testified was the stock of a company that "was a shell with no sales and no operations to speak of and no income". The company had lost money in 1942 and 1943. The contention is that the trustees thereby caused a reduction in trust income for Dorothy from 1945 to date. In the earlier part of this adjudication explanation is made and the reasons given for the trustees' sale of Luria Brothers shares and the purchase of 200 Luria Steel shares. No additional comment is needed here.

(e) Objection is made also to the failure of the trustees as directors, owners and officers of Luria Steel to declare dividends when earnings warranted such action and "when substantial salaries and expenses" were being paid by the trustees to themselves. The salaries of the five brothers averaged $30,000 to $40,000 a year for the thirteen years between 1945 and 1958. There is absent from the record any evidence that the salaries paid were not normal or proper for the work performed or that expenses were unwarranted or excessive. There is nothing before the court evidencing any loss to the objector because of such payments and no damages have been proved.

In any case, it is not this court that has jurisdiction over the internal management of Luria Steel. The trust of the objector is not the major stockholder, and, even though a majority of the common stock of the company was held by the trustees of the estates of the five brothers, this court has no jurisdiction over the company: Goetz Estate (No. 1), 236 Pa. 630 (1912); Watson's Estate, 314 Pa. 179 (1934); Steele Estate, 85 D. & C. 141. (Del. Co. 1953).

The dividend, salary and expense practices of the corporation concern not merely the objector as the settlor and life tenant of a trust holding some of its shares. The trust is, after all, only a minority shareholder. It is the corporation, not the trust, that is accountable in such matters and over it this court has no jurisdiction: Nixon's Estate, 239 Pa. 270 (1913).

(f) Objection is made to the failure of the trustees to make full disclosure of facts relating to the trust. This relates to the trustees' failure to state in their original account that they held as part of principal the shares of stock of companies subsidiary to Luria Steel. However, reference to such shares as assets of the estate was made by the trustees in their two supplementary accounts filed first on February 4, 1961, dur-

ing the litigation. That reference to these assets was not specifically made in the account as originally filed may have been due to the fact that there was no investment of assets in such stock. In any event, no damage has been done and the settlor has not suffered any loss by what must be regarded at most as an unintended oversight. Actually, the trust records show that the estate has held an interest in the shares of the subsidiary companies from the outset. During the audit counsel for the trustees on two occasions fully explained the relevant facts.

The stock certificates of the companies were stamped with a legend or statement showing each of the several trusts' participation or proportionate interest in the capital of such companies. Where a company was liquidated the trust received its proportionate interest in the liquidation, which in the case of Dorothy's trust was over $17,000.

There is no evidence of bad faith or even of refusal to disclose the fact that the trust possessed participation in the ownership of the capital of the several companies. Furthermore, there is no evidence of any intention on the part of the trustees to deal unfairly or other than openly with the objector.

(g) A final objection to the purchase by the trustees of additional shares of Luria Steel for the trusts of Dorothy's brothers is based on the charge that dilution of her investment in such shares resulted. She complains that each trust bought 720 shares on May 1, 1945, and 510 shares on December 31, 1946, at par value of $100, whereas her 200 shares purchased from Alec Luria some months before cost her the then book value of $216.31 per share, the same price paid by the other trusts for the shares that were bought for them at the same time. There is no evidence that at the time of the later purchases the shares were worth more than the $100 paid for them.

As to the dilution, both the objector's and the trustees' financial experts testified that there was theoretical dilution of Dorothy's share to the extent of approximately $27,000. The result of these purchases was that Luria Steel had more capital assets, not that Dorothy would have more stock in her trust had her brothers paid more than par value. No loss was suffered by Dorothy because of their purchase. Even if illegality in the purchase were established, which it was not, any remedy must be sought in the Courts of Common Pleas by the corporation and not by the trust in this court: Nixon's Estate, 239 Pa. 270 (1913).

The several objections above considered are without merit and the objector's claims for surcharge of her trustees based on their actions hereinabove recited are dismissed.

### Summary

The objector as a competent person enjoying what amounts to a fee in the assets of the trust must be considered as having acquiesced in the actions of the trustees of which she now complains, as she had full knowledge of the facts as above related, even though she now protests that she did not know: Lieber's Estate, 342 Pa. 247 (1941); Ward Estate, 350 Pa. 144, 146 (1944); Wilbur's Estate, 334 Pa. 45 (1939).

Her failure to find fault until nearly fifteen years had passed after the acts complained of amounts to confirmation of the investment made by her trustees. See Macfarlane's Estate, 317 Pa. 377 (1935), where, following a reorganization of the family corporate enterprise, exceptant had received the income from the new securities. The Supreme Court held, at page 383, that "Affirmance of the investment may be implied from failure of the beneficiary to object within a reasonable time, although aware of the facts and continually receiving benefits from the investment".

The objector should have used due diligence within a reasonable time after she became aware of the nature of the 1945 agreement and of the investments made by her trustees. She should not have waited until the death of her brother Herbert B. Luria removed him as a likely witness to her acquiescence.

The trustees might have petitioned this court in 1945 for leave to depart from the provisions of the investment clause of the deed in order to accomplish the result desired, namely, that Dorothy's trust assets be safely invested and at the same time yield the necessary income. Had they petitioned the court, it would likely have given the required permission: Longbothom's Estate, 346 Pa. 94 (1943); Brock v. Pennsylvania Steel Company, 203 Pa. 249 (1902); Girard Estate, 73 D. & C. 42 (O. C. Phila. Co. 1950).

The trustees after 1945 could have petitioned for approval of the deviation, nunc pro tunc: Henry's Estate, 341 Pa. 439 (1941); Beebe's Estate, 51 D. & C. 39 (O. C. Phila. Co. 1924); Estate of Rebecca Cridland, Deceased, 132 Pa. 479 (1890).

That the trustees took neither course of action strongly indicates that the trust settlor and life tenant approved the investments they had made on advice of counsel and there was no question about the propriety of that action.

The auditing judge has given full consideration to the arguments advanced by the objector and the authorities cited by her counsel. Of course, the trustees had a duty to act faithfully and prudently. It is our conclusion that they have done so. All claims for surcharge are denied. . . .

And now, March 14, 1968, the account is confirmed nisi.

OPINION SUR EXCEPTIONS

KLEIN, P. J., December 26, 1968.—Almost 80 years ago, in 1889, settlor's grandfather started a modest

business of trading in scrap iron and other metals. The business was continued by his sons and his son's sons. It grew and prospered and became an extremely large and successful enterprise. With the growth of the business sharp differences arose among the members of the family.

In December, 1939, shortly after the death of settlor's father, Max Luria, she, her mother, Sadie Luria, and her five brothers, Herbert B. Luria, William Luria, Henry T. Luria, I. David Luria and Mortimer F. Luria, created a Family Trust, which consisted of seven separate trusts, one of which was the trust for Dorothy Luria Mintz, which is now before us. Four of settlor's brothers were designated trustees.

In December of 1945, a crisis arose in the business as a result of which the Max Luria branch of the family separated their interest from those of the rest of the family and acquired control and ownership of Luria Steel Company, one of the family enterprises. By reason of the speculative nature of the business and in order to guarantee the settlor and her mother security of principal and income, the brothers, upon advice of D. Hays Solis-Cohen, one of our city's most respected and competent lawyers, who was counsel for the family, caused the corporation to issue debenture bonds, which were placed in the trusts for the women. At a later date, additional common stock was issued to the brothers who operated the business.

With the passage of years, Luria Steel prospered. The brothers received substantial salaries for their services to the corporation and the value of their stock enhanced greatly.

Herbert B. Luria, the acknowledged head of the Max Luria branch of the family, after the death of Max, died in 1958. An account was filed on November 3, 1958.

Dorothy Luria Mintz, the settlor, resents very deeply the success of her brothers and insists that they, as trustees, took advantage of her and manipulated the trust assets for their own selfish and improper motives. She has vigorously and acrimoniously attacked their administration of the trust, charging them with many sins, as a result of which she claims they benefited personally and she suffered grave financial losses.

We are of the opinion that her complaints are baseless.

Every possible effort was exerted by counsel for the respective parties to effect a compromise which would bring this unfortunate litigation to a conclusion. After years of delays and negotiations, counsel agreed upon a settlement, which was accepted by the accountants and regarded as eminently fair by the learned auditing judge. The settlement was flatly rejected by the settlor.

The auditing judge, in a comprehensive and scholarly adjudication, reviewed the facts of the case as well as the applicable principles of law, and rejected the settlor's contentions. He refused to surcharge the trustees and confirmed their account.

Exceptions to the adjudication are now before us. We are all in agreement with the auditing judge's conclusions for the reasons set forth by him in the adjudication. Little can be profitably added to what he has already said so well.

The settlor, Dorothy Luria Mintz, was of full age when she executed the trust instrument and when all of the later transactions which affect her interests took place. She is an intelligent woman, who was familiar, or should have been if she had exercised reasonable prudence, with all of the material facts and circumstances concerning the creation and administration of this trust estate. She cannot, at this late date, after

having enjoyed the benefits and advantages of the family arrangement for so many years, now complain of her brothers' conduct as trustees.

Accordingly, the exceptions are dismissed and the adjudication confirmed absolutely.